1    Jason S. Hartley (CA Bar No. 192514)
2    STUEVE SIEGEL HANSON LLP
     550 West C Street, Suite 1750
3    San Diego, CA 92101
     Tel: 619-400-5822
4    Fax: 619-400-5832
     hartley@stuevesiegel.com
5

6    *Attorney for Plaintiff and the Class*

7            **UNITED STATES DISTRICT COURT**

8          **CENTRAL DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| WANDA SMITH, individually and on behalf of all others similarly situated, | Case No. 8:17-cv-629 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| EXPERIAN INFORMATION SOLUTIONS, INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Wanda Smith, individually and on behalf of the Class defined below, makes the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## PARTIES

1.     Plaintiff Wanda Smith ("Plaintiff") is a current resident and citizen of Walton County, Florida. Plaintiff formerly resided in Fort Wayne, Indiana.

2.     Defendant Experian Information Solutions, Inc. is a privately held company that maintains its North American headquarters in Costa Mesa, California. Experian is authorized to do business throughout the country and in the State of California. Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f).

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which grants jurisdiction to any appropriate United States District Court, without regard to the amount in controversy.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District and Defendant's principal place of business is located in this District.

## BACKGROUND FACTS

5.     Experian is a national consumer reporting agency as defined in the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"). Experian generates and sells reports containing consumer information and details of a consumer's credit history (often referred to as "credit reports" or "consumer reports").

6.     Credit reports are used by parties to determine whether and on what terms a consumer will be offered credit, including credit cards, student, car, and small business loans, mortgages, rental housing, and insurance. Credit reports typically

consist of multiple "tradelines" (referred to herein as "accounts"), each of which contains an individual item of credit information concerning the specific consumer.

7.     To compile credit reports, Experian collects information from companies known as "data furnishers." In order to furnish data to Experian, companies must submit a new client application and be approved by Experian's membership department. Experian refers to this process as "onboarding."

8.     Once approved, Experian assigns the data furnisher a unique "Vendor ID" and data reporting "subcode." When a subcode is deleted from Experian's database, the data associated with that subcode will no longer "come to file" meaning it will no longer be included on consumer's credit reports.

9.     Consumers' credit reports can be accessed by "subscribers" that purchase the reports in order to make lending decisions or for other purposes permitted under the FCRA. Subscribers must also submit a new client application and be approved by Experian's membership department in order to access consumers' credit reports.

10.     Experian also sells access to consumers' FICO credit scores, which are numerical values generated by the Fair Isaac Corporation intended to represent the "creditworthiness" of a consumer.

11.     A consumer's payment history accounts for 35% of the consumer's FICO score. Within this category, FICO considers the severity of the negative items (such as the presence of charge off accounts, collection accounts, and late payments), the number of past due items, balances on delinquencies and the recency of the negative items. Thus, a consumer's credit score is heavily penalized by the presence of recent, delinquent accounts.

### Experian, CashCall and Delbert's Role in the Western Sky Loan Scheme

12.     In 2003, Experian approved California-based consumer lending company CashCall, Inc. ("CashCall") as a data furnisher and approved it to access

consumers' credit reports as a subscriber. CashCall's business model was to make high-interest loans to low-credit borrowers, and it was only licensed to make loans to California residents.

13. Representatives from Experian viewed CashCall as a potentially lucrative account because it could cross-sell products and services not only necessary to make lending decisions, but also to facilitate debt collection.

14. Since 2003, Experian's account manager for CashCall was Richard "Rick" Hills, a member of Experian's sales department. Starting in 2006, Mary Cheatham, a senior sales associate within Experian, worked with Rick Hills managing the account.

15. From 2003-2006, CashCall primarily (if not exclusively) made loans to customers in California. In 2006, CashCall decided to expand its business beyond California. However, it opted not to apply for or obtain licenses to lend in other states because in many of those states, the usury laws would not permit CashCall to make or service loans with the high interest rates it was accustomed to charging. Instead, CashCall expanded its business by paying two state-chartered federally-regulated banks to make loans that CashCall then purchased and serviced. The Maryland Court of Appeals recently referred to CashCall's arrangement with the state-chartered banks as a "rent-a-bank' scheme" designed to take advantage of a federally-insured bank's exemption from state usury limits. *CashCall, Inc. v. Maryland Comm'r of Fin. Regulation*, 139 A.3d 990, 995 n.12 (Md. 2016).

16. CashCall's expansion under the "rent-a-bank" model was a boon for Experian because CashCall paid Experian to access a significantly greater number of consumer credit reports. In addition, Experian marketed and sold products to CashCall designed to improve debt collection. For example, CashCall began reporting delinquent accounts on consumers' credit reports in order to entice them to continue making payments or risk damaging their credit. Experian also approved

CLASS ACTION COMPLAINT

CashCall's request to purchase powerful debt collection products like "MetroNet," which Experian describes as providing "precise access to comprehensive contact data on more than 140 million households and 19 million businesses."

17.    In October 2008, the State of West Virginia sued CashCall alleging illegal high interest lending and abusive debt collection practices resulting from the "rent-a-bank" scheme. CashCall lost in trial and was ordered to pay civil penalties of $13 million and cancel all outstanding debts by West Virginia residents.

18.    In August 2009, the State of California sued CashCall for engaging in "loan shark tactics" to collect debt from consumers in violation of California law. CashCall settled four days later for $1 million.

19.    CashCall's lending model was successful until the two state-charted banks withdrew from the "rent-a-bank" arrangement under substantial pressure from the FDIC.

20.    Thereafter, CashCall's owner, John Paul Reddam ("Reddam"), decided to shift its "rent-a-bank" model into a "rent-a-tribe" scheme that operated in a similar manner. Under the scheme, loans made by a federal-recognized Indian tribe purportedly would not have to comply with state licensing and usury laws because tribal entities are entitled to Indian tribal sovereign immunity. Thus, CashCall could partner with an Indian tribe to make illegal loans in the tribe's name and avoid prosecution.

21.    In 2009, representatives from CashCall met with Martin Webb, a member of the Cheyenne River Sioux Tribe ("Tribe") in South Dakota, to discuss forming a tribal lending entity through which Webb would offer high-interest loans over the Internet and then immediately sell the loans to CashCall.

22.    As a result of those discussions, Webb formed Western Sky Financial, LLC ("Western Sky") to make online loans and facilitate the illegal loan scheme. Although Webb was a member of the Tribe, Western Sky was not organized under

tribal law. Instead, Western Sky was formed as a South Dakota Limited Liability Company with Webb serving as its sole owner. CashCall likewise formed a wholly-owned subsidiary called "WS Funding" in order to fund the loans on Western Sky's behalf.

23. Pursuant to an agreement between Western Sky and CashCall, Western Sky would offer loans over the Internet, which CashCall agreed to fund through WS Funding. CashCall would then purchase the loans from Western Sky three days after the funding of each loan. As such, borrowers made all of their loan payments to CashCall, not Western Sky.

24. For its role in the scheme, CashCall paid Western Sky the full amount of the loan disbursed to the borrower plus a premium of approximately 5%, with a guaranteed minimum monthly payment of $110,000. Thus, CashCall was entitled to collect and keep the principal plus all the interest bearing from the loans, making debt collection central to its business model.

25. Western Sky loans ranged from $850 to $10,000. These loans carried upfront fees, lengthy repayment terms, and annual percentage rates (APRs) ranging from 89.68% to 342.86%. The precise terms evolved over the life of the program and varied based on the amount of the loan. The following table, copied from Western Sky's website, summarizes Western Sky's loan offerings:

| Loan Product | Borrower Proceeds | Loan Fee | APR | Number of Payments | Payment Amount |
|---|---|---|---|---|---|
| $10,000 | $9,925 | $75 | 89.68% | 84 | $743.49 |
| $5,075 | $5,000 | $75 | 116.73% | 84 | $486.58 |
| $2,600 | $2,525 | $75 | 139.22% | 47 | $294.46 |
| $1,500 | $1,000 | $500 | 234.25% | 24 | $198.19 |
| $850 | $500 | $350 | 342.86% | 12 | $150.72 |

26. The total cost of the Western Sky loans was substantial. For example, a consumer borrowing $5,000 would have to pay more than $40,000 over a 84-month repayment term—more than eight times the amount borrowed.

27.     To facilitate the scheme, CashCall and Western Sky needed assistance from a consumer reporting agency willing to allow it to access consumers' credit information to make lending decisions and engage in debt collection.

28.     To facilitate the CashCall / Western Sky partnership, CashCall requested that Experian approve Western Sky as a new client. In early 2010, Mary Cheatham prepared all the new client documentation on behalf of Western Sky and Experian approved Western Sky as a new client.

29.     Experian's account managers understood the nature of the arrangement between CashCall and Western, with Rick Hill acknowledging that Western Sky was a "tribal lender" and that CashCall "entered into an agreement with Western Sky to what I viewed as nationalize the business, be able to lend across the country, and not just in their state licensed states."

30.     Experian approved Western Sky to purchase consumers' credit reports in order to make lending decisions.

31.     To assist in the debt collection side of its business, CashCall also formed the company Delbert Services, Corp. ("Delbert"). Delbert was also owned by John Paul Reddam and formed for the purpose of collecting on Western Sky loans that were delinquent or charged off. Thus, if a borrower stopped making payments to CashCall, the loan would be transferred to Delbert and Delbert would then engage in more aggressive collection tactics.

32.     In 2010, Delbert was also approved for membership by Experian. Delbert was able to purchase products and services geared towards debt collection, including reporting delinquent accounts on consumers' reports. Delbert's membership application listed John Paul Reddam as the owner and CashCall as its parent company.

33.     From 2010-2013, CashCall funded hundreds of thousands of loans through Western Sky, generating millions of dollars for Experian annually.

### *Regulators Target the Western Sky Loan Scheme*

34.    Almost immediately after CashCall and Western Sky started offering online loans, state and federal regulators began taking legal action to thwart the rent-a-tribe scheme. Since 2009, at least 28 states and the District of Columbia, the Federal Trade Commission (FTC), and the Consumer Financial Protection Bureau (CFPB) have taken legal action against Western Sky, CashCall and/or its affiliates for making loans without proper state licensing, violating state usury laws, consumer protection violations, and for illegal debt collection practices.

35.    As such, there is a vast public record going back years detailing the lending scheme. For example, on June 4, 2013, the State of New Hampshire Banking Department issued an Order to Cease and Desist to Reddam, CashCall and WS Funding. After conducting an extensive review of documents subpoenaed from CashCall, the department made a number of specific findings regarding the operation of the Western Sky Loan scheme:

> After detailed review of the respondents' business scheme, it appears that Western Sky is nothing more than a front to enable CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators. Western Sky holds itself out to the public as a stand alone tribal entity which provides small loans and payday loans to consumers. In reality, however, CashCall creates all advertising and marketing materials for Western Sky and reimburses Western Sky for administrative costs. CashCall reviews consumer applications for underwriting requirements. CashCall funds the loans. CashCall services the loans. Western Sky does not receive any payment from consumers for the loans.[1]

---

[1] Recently, this Court issued an order granting the CFPB's motion for partial summary judgment against CashCall, Delbert, WS Funding, and Reddam, finding that the defendants created an "intentionally complicated and sham" loan program that violated federal law and concluding that by "servicing and collecting on Western Sky loans, CashCall and Delbert Services created the 'net impression' that the loans were enforceable and that borrowers were obligated to repay the loans in accordance with the terms of their loan agreements" when in actuality "that impression was patently false — the loan agreements were void and/or the borrowers were not obligated to pay." *CFPB v. CashCall, Inc*., No. CV 15-7522-JFW, 2016 WL 4820635, at *10 (C.D. Cal. Aug. 31, 2016).

CLASS ACTION COMPLAINT

36. Experian was well aware of the extensive litigation pending against these companies. For example, Rick Hills set up "Google alerts" to inform him any time the phrases "CashCall" or "Paul Reddam" were mentioned in a news article. On more than 25 occasions between July 12, 2013 and December 31, 2013, Mr. Hills received Google alerts in his email inbox linking him to articles discussing lawsuits filed against CashCall and Reddam.

37. In April 2013, Experian's membership department performed a membership review on CashCall triggered by CashCall's request to purchase new products or services. Experian's review included copies of consumer complaints against CashCall from the website "Ripoff Report"; an article entitled "Payday Lender CashCall Fined $13 Million for Violating Consumer Rights Under FDCPA" discussing the $13 million award against CashCall in West Virginia; and an article entitled "CashCall ordered to pay $1 million on penalties and legal expenses" discussing the State of California's settlement with CashCall relating to debt collection abuses.

38. Notwithstanding, Experian continued to approve CashCall's applications to access more products and services from Experian. Under the comments section of the membership review, Experian wrote: "There are many complaints and law suits [sic] against CashCall but nothing difinitive [sic] showing CashCall has broken any laws has been found."

39. On August 20, 2013, Experian's membership department performed another membership review on CashCall. This review acknowledged even more of the extensive litigation against CashCall, with the file including notated copies of:

   a. A copy of the Complaint for permanent injunction, civil penalties and other equitable relief filed by the State of California against CashCall in 2009;

   b. A final judgment and permanent injunction entered against CashCall in the California action;

c.  A news article entitled "N.Y. State accuses CashCall of loan abuses" discussing the New York attorney general lawsuit against Western Sky and CashCall;

d.  A news article entitled "WV wins $15 million judgment against CashCall lending company" discussing a bench trial won by the State of West Virginia against CashCall's for its rent-a-bank scheme;

e.  A news article entitled "CashCall agrees to pay $1 million to settle state allegations it ran deceptive ads, used "loan shark tactics" discussing the California settlement;

f.  A news article entitled "Bloom penalizes Calif. lender $13 million" discussing the West Virginia action; and

g.  Excerpts from the website "Pissed Consumer" relating to consumer complaints against CashCall.

40.    On the same date August 20, 2013, Rick Hills sent an email to senior members within the sales department acknowledging that the allegations describing CashCall and Western Sky's relationship as "rent-a-tribe" scheme were "essentially correct."

41.    Amid mounting pressure, Western Sky announced in September 2013 that it was ceasing operations immediately. Representatives from Experian expressed "shock" at the news and estimated that the impact on Experian's 2014 revenues would be $1.2 million. As a result of the sudden drop in business, Rick Hills did not receive his personal bonus from Experian in fiscal year 2014.

42.    In October 2013, Experian's primary competitor, Equifax, made the decision to stop reporting all Western Sky accounts.

43.    Western Sky's cessation of offering loans did not stop CashCall and Delbert from continuing to attempt to collect on thousands of outstanding loans—using negative credit reporting through Experian or the threat of such as a primary method of attempting collection.

44.    In fact, notwithstanding Experian's awareness of a number of pending lawsuits, court orders, and judgments against CashCall and Delbert relating to the Western Sky scheme, in late 2013 Experian approved Delbert for a new function, to

CLASS ACTION COMPLAINT

become a loan servicer and agent of CashCall. This would allow Delbert, along with CashCall, to furnish data to Experian relating to Western Sky loans. To begin reporting these accounts, Experian assigned Delbert a unique data reporting subcode under CashCall's company ID.

45.   In December 2013, three months after Western Sky and CashCall ceased offering loans, Delbert began reporting a portfolio of 125,746 accounts relating to outstanding Western Sky loans, all of which were previously reported by CashCall.

46.   This meant consumers' reports would contain two accounts relating to their Western Sky loan: one from CashCall and one from Delbert. The CashCall account would report as "purchased by another lender" referring to Delbert, and report the account history on the loan up until the purchase date.

47.   Likewise, the Delbert account would report "purchased from CashCall Inc" and report the account history on the loan after Delbert took over collection.

48.   The vast majority of accounts reported by Delbert were seriously delinquent and charge-off accounts, meaning they would display as a "negative credit item" on consumers' reports.

### Experian's Decision to Delete All Western Sky Accounts

49.   In January 2014, Western Sky entered into a $1.5 million settlement agreement with the State of New York that invalidated more than 18,000 loans. As a condition of the settlement, Sean Bennett, a representative from CashCall, requested that Experian delete all Western Sky accounts associated with New York borrowers. To capture all borrowers with Western Sky loans, Experian had to delete files reported by both CashCall and Delbert.

50.   Experian later did the same with borrowers from Connecticut, Vermont, and Pennsylvania, and in each instance, Mary Cheatham assisted in deleting both CashCall and Delbert accounts.

51.   Around the same time in early 2014, Experian employee Carmen Hearn was informed by David Proctor, a senior vice president, that Experian management

was considering deleting all data relating to Western Sky loans and requested that Ms. Hearn review the situation.

52.     Experian's sales department was not in favor of a mass deletion, which created an "internal battle" between sales and management. Members of the sales department expressed frustration about management's "lack of transparency" concerning the deletion. On several occasions, the sales team would withhold relevant legal documents from Experian's management because they thought it would "add fuel to the fire" in favor of mass deletion.

53.     In or about January of 2014, Experian adopted a new policy for "reinvestigating" consumer disputes relating to CashCall and Delbert. Under the FCRA, if a consumer disputes the completeness or accuracy of an item contained in his or her credit report directly with the credit reporting agency (CRA), the CRA must conduct a "reasonable reinvestigation" within 30 days after receiving the notice of dispute from the consumer. In conducting the reinvestigation, the CRA must review and consider all relevant information submitted by the consumer, and within five business days of receiving the dispute, notify the furnisher of the dispute including all relevant information that the credit reporting agency received from the consumer.

54.     After receiving a dispute from the CRA, a furnisher (such as CashCall and Delbert) must: (a) conduct an investigation with respect to the disputed information; (b) review all relevant information provided by the credit reporting agency; and (c) report the results of the investigation to the credit reporting agency. If the investigation finds that the reported information is incomplete or inaccurate, the furnisher must report those results to the credit reporting agency before the end of the 30-day reinvestigation period.

55.     Upon receiving a consumer dispute, Experian's standard practice is to pass along the dispute to the furnisher and rely on the furnisher's determination of whether the dispute is valid in order to satisfy its reinvestigation requirements under

the FCRA. With respect to CashCall and Delbert accounts, Experian made the highly-unusual decision to deviate from this standard procedure and "auto-delete" CashCall and Delbert as soon as they were disputed by the consumer, without first seeking verification from the furnisher.

56.     As part of the deletion review process, Experian confirmed that Western Sky loans were being reported by two companies under two separate subcodes, CashCall and Delbert. In an April 16, 2014, email to Experian's data development department, Mary Cheatham confirmed the reporting structure of Western Sky loans: "CashCall reports their consumer loans via two different servicing systems. First is from CashCall directly, Vendor ID is APNU, subcode 1586386. The second is from their sister company Delbert Services, who acts as their agent, Vendor ID is BCFZ, subcode is 2245140. Both are under the CashCall Inc. company id of 224523."

57.     Because CashCall also reported its own portfolio of accounts in addition to the Western Sky portfolio, Experian's management requested that CashCall assist in "re-subcoding" CashCall's portfolio in order to segregate (and ultimately delete) the Western Sky-originated accounts. A member of Experian's data development department noted in a February 2014 email that Experian needed CashCall to re-subcode the Western Sky accounts so that they would not be re-reported with CashCall's own accounts after the deletion.

58.     A re-subcode was unnecessary for the Delbert subcode because it only reported Western Sky accounts. This was confirmed in an April 18, 2014 e-mail from Rick Hills to Mary Cheatham and Experian management: "ALL of the loans reported on the Delbert subcode are Western Sky originated. (Good news.)"

59.     On May 30, 2014, Experian's data development department confirmed that the re-subcode was completed and CashCall's portfolio of 359,371 Western Sky accounts would report under the new subcode 2292030. Delbert continued to report its 125,000 plus Western Sky accounts under subcode 2245140.

60.    That same month, Experian learned that Western Sky accounts associated with New York borrowers were still reporting on consumers' reports. Experian's sales staff expressed frustration that Experian's data development department "missed the boat" with the deletion by failing to ensure the data had been properly deleted.

61.    Following the "re-subcode" of the CashCall accounts, Experian made the decision to delete all CashCall and Delbert accounts reporting Western Sky loans. In order to commence the deletion process, Carmen Hearn instructed Rick Hills to inform the clients of Experian's intent to delete the accounts.

62.    Rick Hills referred to the deletion directive as "complete B.S." – and over the next six months continuously delayed in informing his clients about Experian's decision to delete. For example, on June 27, 2014, CashCall and Delbert still had not been informed about the deletion and Carmen Hearn noted in an email to management that notification was "very past due."

63.    On July 3, 2014, Carmen Hearn emailed sales directly and said "I do need an update on this. It's far overdue now and David [Proctor] needs to give counsel an update." After being prompted again on July 25, 2014, Rick Hills informed his sales colleague "I SO-SO-SOOOOOO **don't** want to deal with this right now."

64.    By late August 2014, after nearly four months of delay, Carmen Hearn acknowledged the delay was out of the norm and expressed frustration at the sales staff for failing to notify their clients and commence the deletion.

65.    It was not until October 2014 that Rick Hills finally informed CashCall and Delbert of Experian's intent to delete their accounts associated with Western Sky loans.

### *Experian Fails to Delete the Delbert Accounts*

66.    On November 24, 2014, Carmen Hearn sent an e-mail outlining assignments to various individuals and departments within Experian to facilitate the deletion of all Western Sky-originated tradelines (the "mass deletion").

67.    Carmen Hearn assigned Mary Cheatham and Rick Hills the task of submitting a Master File Maintenance Report (MFMR), which would "start [the deletion] process internally" by instructing Experian's data development department to delete the necessary data reporting subcodes. Experian maintains procedures for completing a MFMR, which explain the purpose and process for facilitating the deletion of a subcode:

> Purpose of MFMR's: An MFMR completes the cancellation process. The form is sent to the data organization to address data reporting and then is forward [sic] to subcode maintenance for the status of the account to be changed in Customer Master from "H" to "D" or "P."

68.    The procedures state that a subcode status should be changed to "D" for delete when "the account has no data on file or the company is out of business." Setting the status to delete would ensure the data would no longer "come to file" and no longer be included on consumers' credit reports.

69.    Mary Cheatham was in charge of submitting the MFMR form necessary to commence the deletions with Rick Hills overseeing the process.

70.    On December 15, 2014, Debbie Stout, a member of Experian's data development department, acknowledged receipt of the MFMR for the CashCall subcode from Mary Cheatham.

71.    Debbie Stout then sent a "Data Development Notification of Key Action" to at least 15 individuals and two listservs within Experian informing them that "356,902 records reporting under subcode 2292030, vendor ID DAPNU [CashCall]" were set to delete.

72.    On December 23, 2014, Ingrid Kenneth, Experian's data manager director, sent an email to Carmen Hearn and Mary Cheatham confirming that

deletion of CashCall subcode 2292030 had been completed the previous day. This confirmation was relayed to members of Experian's management and representatives from CashCall.

73.     Despite claiming an intent to delete all Western Sky accounts at that time, Experian failed to submit a deletion request for the more than 125,000 Western Sky accounts being reported by Delbert under subcode 2245140.

74.     The following month, Delbert went out of business and instructed Experian to cancel all services.

75.     Experian's internal guidance to furnishers provides that: "If [reported] accounts cannot be verified on your system then they should be deleted." Likewise, when an entity furnishing to Experian goes out of business, Experian's policy is to delete all data being reported by that furnisher because it can no longer be verified. Experian's corporate representative Kimberly Cave (f/k/a Hughes) testified:

> [If a furnisher is] not an active reporter then I would expect there not to be data on file because that's going to be handled by data development. So if you go out of business and no longer meet requirements for membership we can't keep your data on file. If there's no longer someone responsive to your data I can't keep it on file because in the interest of the consumer I can't verify it at that point.

76.     On January 14, 2015, a representative from Delbert informed Mary Cheatham that effective January 1, 2015, Delbert was no longer in business and wanted to "discontinue use of any and all services provided by Experian" including data furnishing. Ms. Cheatham immediately responded: "I will take care of this today. We will turn off all existing subscriber codes."

77.     Ms. Cheatham then listed the four subscriber codes under the Delbert company ID and confirmed their cancellation as of January 21, 2015. Ms. Cheatham failed to include subcode 2245140, the Delbert subcode reporting Western Sky loans under CashCall's company ID.

78.     Despite being made aware that the Delbert accounts were still coming to

CLASS ACTION COMPLAINT

file and reporting on at least six occasions, Experian did not delete the Delbert accounts until April 2016.

### *Experian was Expressly Informed the CashCall Accounts Started Re-Reporting*

79.   In addition to failing to delete the Delbert accounts, Experian learned in June 2015 that a subset of the CashCall accounts had started re-reporting.

80.   On June 1, 2015, Sean Bennett from CashCall informed Mary Cheatham that he was receiving complaints about Western Sky-originated accounts still being included on consumers' credit reports. After Mr. Bennett provided a "bullseye"[2] with eight examples of consumers' reports containing Western Sky accounts, Mary Cheatham requested that Debbie Stout from Experian's data development department review the bullseyes and identify the problem.

81.   On June 4, 2015, Debbie Stout responded to Mary Cheatham and Rick Hills identifying the problem:

> Looking at the two attached accounts the first one with the date open on 08/13/2013 was reported as a purchased portfolio from: CASHCALL and was last reported from Delbert on 11/01/2014. What is interesting is that CASHCALL vendor id APNU reported the account as a special comment code of AH (Purchased by Another Company) on 08/01/2013. Then we maintenance the accounts to a status DA (delete) on 12/19/2014. CashCall started re-reporting these accounts again on their 01/01/2015 transmission and is no[w] back to being reported through their 05/01/2015 transmission and the most current status is 30 days late. Yes this is reported under the subscriber code of 2292030 . . . there is a reference to 'Western Sky' in the branch name in customer master.
>
> ***
>
> Your question after I went through all the above is correct that CASHCALL has re-reported this account after it went from Purchased by Another Lender, then to our 'Delete' from maintenance to now being re-sent in with the same account number but different date open to the account and of course reported under a different subscriber code and vendor id.

---

[2] A bullseye allows the furnisher to see how data is being displayed on consumers' reports.

82.    In other words, the CashCall accounts that were deleted in December 2014 started re-reporting the following month, but they reported differently than they had before the deletion. Rather than showing the account as closed and "purchased by another lender" as they would have before the mass deletion, the accounts came back to file with a different date open and reported as active, currently-delinquent accounts that were being updated on a monthly basis. Debbie Stout also confirmed in the communication that the Delbert accounts had never been properly deleted in December 2014 or when Delbert went out of business in January 2015 because nobody at Experian submitted the MFMR form.

83.    This was a major reporting error. The designation "purchased by another lender" is a final account status that should never come back to file as an active account. In fact, CashCall did not even own the portfolio of accounts it started "re-reporting" January 2015 even though they were reporting as active, currently-delinquent accounts.

84.    Mary Cheatham acknowledged that the error occurred because Experian failed to set CashCall subcode 2292030 to "inactive" after the mass deletion so that the data could no longer come to file. Experian later confirmed that at least 42,295 CashCall accounts started re-reporting in this manner.

85.    Fixing this error would have taken a matter of hours. But despite being explicitly informed of these major reporting errors, neither Mary Cheatham nor Rick Hills took any action for over four months. Mary Cheatham acknowledged that Experian had no justification for the delay:

> Q. . . . isn't this the type of issue that would typically become a high priority that needs to get addressed and fixed?
>
> **A. Yes**.
>
> Q. Immediately?
>
> **A. Yes**.
>
> Q. Do you know why it didn't happen in this instance?
>
> **A. Because I dropped the ball**.

86.    Over the next several months, Sean Bennett of CashCall followed up with Mary Cheatham on at least three occasions asking for confirmation that Western Sky accounts had been deleted, to which Ms. Cheatham did not immediately respond.

87.    On September 30, 2015, Rhonda Gee from Experian's data department wrote Mary Cheatham an e-mail marked high priority stating: "I was assigned to work the accounts for Western Sky - please let me know which subcode or subcodes require maintenance to delete the accounts." Again, Ms. Cheatham did not respond.

88.    On October 15, 2015, Experian's data department again followed up and Mary Cheatham finally responded that "We definitely need to stop accepting data from CashCall for the Western Sky subcode, and we'll need to process another delete for those that got through since the original delete."

89.    That same day, Mary Cheatham finally responded to Sean Bennett's request for confirmation the Western Sky accounts had been deleted: "Hi Sean – we are working with Data Management on this request now. We did delete all Western Sky data in December of 2014. We have noticed that some has been sent in by CashCall so some tradelines have come back to file. We have made a change to our side to bypass subcode 22920230 if we see it come in via data reporting in the future. We are going to do one more cleanup of the data . . ."

90.    Since January 1, 2015, Experian has received 292 disputes from consumers relating to CashCall accounts reporting under subcode 22920230. Thus, Experian was put on notice 292 times that the CashCall accounts were still reporting, yet nobody from Experian's disputes department inquired as to why disputes were coming in on accounts that were not supposed to be on file.

91.    Despite being put on notice of the reporting error on numerous occasions, CashCall accounts reporting under subcode 22920230 were still coming to file on consumers' credit reports as recently as July 2016.

## FACTS AS TO PLAINTIFF WANDA SMITH

92.   On or about March 12, 2012, Plaintiff took out an online loan from Western Sky in the amount of $5,000 through Western Sky's website from her then home in Indiana.

93.   Under the terms of the loan agreement, the disclosed annual interest rate on the loan was 116.73% and the finance charge on the loan was $36,091.55, with payments to be made over a period of seven years. Thus, over the life of the loan, Plaintiff owed an astounding $41,091.55 in order to pay off her loan.

94.   Consistent with its standard practice, Western Sky "sold" the loan to CashCall immediately after it was taken out, and CashCall was responsible for collection on the account.

95.   From March 2012 through October 2013, Plaintiff made payments on the loan to CashCall.

96.   On or about October 30, 2013, Plaintiff received an email informing her that her loan had been sold and Delbert had the legal right to perform collection on the loan. From November 2013 through August 2014, Plaintiff made payments on the loan to Delbert.

97.   In total Plaintiff paid approximately $13,000 on the loan to CashCall and then Delbert. After learning the loan may be unlawful under Indiana law, Plaintiff stopped making payments and filed complaints with the Consumer Financial Protection Bureau and the Office of the Indiana Attorney General, among others.

98.   On April 8, 2015, Experian prepared a consumer disclosure for Plaintiff that included a CashCall account as a "negative" credit item on her disclosure.

99.   The account should not have been reporting at all given that Experian deleted the account in December 2014, but failed to set the CashCall subcode to "inactive" to prevent the account from coming back to file.

100.   Additionally, the account included the exact errors described in Debbie Stout's June 4, 2015 email. The CashCall account did not show that the account had

been "purchased by another lender" or include a record of Plaintiff's payments on the loan prior to the transfer to Delbert in October 2013, as it would have prior to the mass deletion. Instead, the account displayed as an active "charge off" account with "$2,606 past due as of Feb 2015" even though CashCall no longer owned the loan and had not been collecting on the loan since October 2013.

101.   The CashCall account included a "reported since" date of January 2015 and stated under account history: "120 days past due as of Jan 2015" and "Charge Off as of Feb 2015." These representations were not based in fact because CashCall sold the loan to Delbert in October 2013 and had no responsibilities on the account after that time, and Delbert was no longer in business as of January 1, 2015.

102.   Even worse, because Experian failed to delete the subcode reporting the Delbert accounts as well, Plaintiff's report also included an *active Delbert account relating to the same loan*. The Delbert account listed the loan as "open" with "$1,031 past due as of Nov 2014."

103.   Thus, Plaintiff's reports included two delinquent accounts relating to the same loan, both reporting as active, neither of which should have been on file. Both before and after receiving her April 8, 2015 consumer disclosure, Experian prepared credit reports containing this inaccurate information that were transmitted to third parties. The presence of this inaccurate information had a negative impact on Plaintiff's credit standing and would be expected to adversely affect credit decisions.

### *Experian Willfully Violated its Duties under the FCRA*

104.   Because of the significant impact inaccurate information on a credit report can have on a consumer's livelihood, Experian is required by law to ensure the information it receives from furnishers (and subsequently sells to subscribers) is reliable and accurate before it is included on a consumer's report.

105.   To this end, Congress has recognized the "vital role" and "grave responsibilities" of credit reporting agencies and the importance of "fair and

accurate" credit reporting. 15 U.S.C. § 1681(a). The congressional emphasis on the need for accuracy is indicated in 15 U.S.C. § 1681e(b), which requires that "whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

106.   A credit report is "inaccurate" within the meaning of § 1681e(b) if it is "patently incorrect or materially misleading." *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890-91 (9th Cir. 2010). Information on a credit report is "materially misleading" if it is "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Id*. at 890 (quoting *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009)).

107.   Under 15 U.S.C. § 1681n, where a defendant "willfully" violates the FCRA, a plaintiff may seek statutory and punitive damages. 15 U.S.C. 1681n(a)(1)(A). Actual damages are not required where FCRA violations are willful. If a plaintiff can prove a willful violation of the FCRA, the plaintiff will be entitled to statutory damages of $100 to $1,000 for each such violation. 15 U.S.C. § 1681n(a)(1)(A).

108.   A willful violation includes both knowing violations and actions in "reckless disregard of a requirement" of the FCRA. *See Safeco Ins. Co. v. Burr*, 551 U.S. 47, 56-58, 71 (2007). A defendant's action or inaction is reckless if it creates "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id*. at 68.

109.   Plaintiff's April 8, 2015 disclosure establishes that Experian prepared credit reports that were both patently incorrect and materially misleading within the meaning of § 1681e(b) on multiple grounds

110.   The statements contained in the reports that the CashCall account: (a) was charged off in February 2015; (b) $5,057 was written off; and (c) $2,606 was past due as of February 2015 were patently incorrect. Plaintiff's account was sold by

CashCall in 2013, so it could not have been "charged off" by CashCall in February 2015. For the same reason, CashCall could not have "written off" $5,057 as of January 2015 or claimed $2,606 was past due as of February 2015 when it did not own the loan and was not responsible for collecting payments. There is no factual basis to support these inaccuracies.

111.   These patent errors are also supported by the fact that CashCall was informed by Experian that the accounts were no longer reporting, CashCall did not intend for the accounts to keep reporting, and CashCall was not actively updating the accounts in January 2015 when the accounts came back to file. As noted by Experian's data development department, the fact the CashCall accounts reported as "purchased by another company" as of August 2013, then were "maintenanced" to delete on December 19, 2014, and then came back to file with different information on January 2015 (and apparently started updating on a monthly basis) was a clear reporting error that Experian let happen by failing to set the CashCall subcode to inactive.

112.   Plaintiff's reports were also materially misleading on multiple grounds. First, the presence of the negative CashCall account on its own made the reports materially misleading because the account was not supposed to be on file and was only present due to an error by Experian. The account also included information that was patently incorrect and drastically different than what would have reported prior to the mass deletion.

113.   The presence of the negative CashCall account on Plaintiff's reports had an adverse effect on Plaintiff's FICO credit score and would be expected to adversely affect credit decisions. Not only was the CashCall account reporting as a "charge off" account which can heavily penalize a consumer's credit score, it was inaccurately reported as a "recent" charge off (February 2016), which is given more weight under FICO's scoring model.

114.   Additionally, the reports were materially misleading because the CashCall account omitted the material information that the account had been "purchased by another lender" and closed in October 2013. They also failed to include Plaintiff's account history on the loan up until the purchase date.

115.   Finally, the reports were materially misleading because they contained two active accounts relating to the same loan, both reporting as negative credit items. Experian has acknowledged that consumer reports should never contain two tradelines relating to the same account because the consumer is penalized twice when third parties are assessing the consumer's credit risk and creditworthiness.

116.   Indeed, under the FICO scoring model, the number of delinquent accounts, recency of delinquent accounts, and cumulative past due accounts all impact a consumer's credit score. The presence of two delinquent accounts relating to the same loan would increase all of these factors and have an adverse effect on a consumer's credit score.

## CLASS ACTION ALLEGATIONS

117.   Description of the Class: Plaintiff brings this class action on behalf of herself and other similarly situated individuals. Pursuant to Federal Rule of Civil Procedure 23(b)(3), Plaintiff seeks certification of the following class of individuals:

> All persons whose Experian consumer report contained an account from CashCall, Inc. reflecting delinquency on a loan originated by Western Sky Financial, LLC on or after January 1, 2015 (the "Class").[3]

In the alternative, seeks certification of the following class of individuals:

> All persons whose Experian consumer report contained an account from CashCall, Inc. reflecting delinquency on a loan originated by Western Sky Financial, LLC on or after January 1, 2015 omitting that the account had been purchased by another party and closed at a prior date.[4]

---

[3] For purposes of these class definitions, "delinquency" means accounts that have been charged off, sent to collection, and/or reflect past due or late payments that were not subsequently brought current. The accounts report as "negative credit items" on a consumer report.

[4] The alternative class definitions are collectively referred to as the "Class" herein.

118.   Excluded from the Class are Defendant's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

119.   <u>Numerosity</u>: The proposed Class is so numerous that individual joinder of all members is impracticable. While members of the Class may be identified through records maintained by Defendant Experian, preliminary evidence suggests that the classes contain up to 43,000 members.

120.   <u>Common Questions of Law and Fact Predominate</u>: There are many questions of law and fact common to Plaintiff and the Class, and those questions substantially predominate over any questions that may affect individual Class members. Common questions of law and fact include:

a.   Whether Plaintiff and class members' reports are "inaccurate" within the meaning of § 1681e(b);

b.   Whether Experian followed reasonable procedures to assure maximum possible accuracy as required by § 1681e(b); and

c.   Whether Experian's conduct was "willful" under § 1681n entitling Plaintiff and class members to statutory damages.

121.   <u>Typicality</u>: Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have been similarly affected by the actions of Experian.

122.   <u>Adequacy of Representation</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex and class action litigation. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.

123.   <u>Superiority of Class Action</u>: Plaintiff and the members of the Class suffered, and will continue to suffer, harm as a result of Experian's conduct. A class

action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Class is impractical. Even if individual class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Experian's common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the class members.

**COUNT I**
**Violations of the Fair Credit Reporting Act 15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure**
**Maximum Possible Accuracy**
***(On Behalf of Plaintiff and the Class)***

124. Plaintiff incorporates the foregoing paragraphs as if set forth fully herein.

125. Experian is a "person" and a "consumer reporting agency" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

126. Plaintiff and members of the Class are "consumers" as that term is defined by 15 U.S.C. § 1681a(c).

127. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

128. Experian prepared inaccurate and materially misleading credit reports relating to Plaintiff which had a negative impact on her credit score, creditworthiness, and credit standing.

129.   In preparing these reports, Experian failed to follow reasonable procedures to assure maximum possible accuracy of the information contained in the reports when, among other things, Experian:

a.   Permitted the CashCall subcode 2292030 to "re-report" in January 2015 just one month after the accounts were deleted at Experian's request;

b.   Permitted the CashCall subcode 2292030 to report with new and differing information than it did prior to the mass deletion;

c.   Failed to correct the data reporting error even after Experian was expressly informed of issue in June 2015;

d.   Permitted accounts to report under CashCall subcode 2292030 as recently as July 2016 despite being made aware of the error on multiple occasions;

e.   Failed to delete the CashCall accounts even after Experian's disputes department received nearly 300 disputes regarding accounts reporting under CashCall subcode 2292030 in 2015 and 2016 and did not alert other departments within Experian;

f.   Failed to train employees on how to properly delete subcodes;

g.   Failed to verify that subcodes Experian made the decision to delete or are subject to deletion pursuant to Experian's policies are actually deleted;

h.   Failed to have controls in place to monitor for the presence of subcodes that Experian made the decision to delete or are subject to deletion pursuant to Experian's policies;

i.   Failed to have controls in place to detect inconsistencies in reported data such as subcodes switching from "delete" to active;

j.   Failed to have proper controls in place to detect inconsistencies in reported data such as an account switching from a final account status of "purchased by another lender" to reporting as an active, currently-delinquent account; and

k.   Failed to communicate between departments when Experian receives disputes relating to a subcode that Experian made the decision to delete or is subject to deletion pursuant to Experian's policies.

130.   In addition to the facts summarized above, Experian's conduct was "willful" in that Experian's actions or inactions "created an unjustifiably high risk of harm" when, among other things, Experian:

a.    Made the decision to delete all Western Sky-originated accounts but failed to follow its own procedures to assure the CashCall data was deleted and not coming back to file;

b.    Permitted the CashCall subcode 2292030 to "re-report" in January 2015 despite the fact that Experian's data development department identified possible "re-reporting" as an issue in February 2014 and authorized the "re-subcode" so Experian could prevent re-reporting;

c.    Permitted the CashCall subcode 2292030 to "re-report" in January 2015 just one month after the accounts were deleted at Experian's request despite being put on notice of this issue previously with the New York deletion;

d.    Violated its own procedures by failing to set the CashCall subcode 2292030 to "inactive" at the time of the mass deletion in December 2014;

e.    Failed to have controls in place to monitor for the presence of subcodes that Experian made the decision to delete or are subject to deletion pursuant to Experian's policies;

f.    Failed to adopt reasonable procedures to detect and correct reporting errors of this type;

g.    Failed to exercise adequate oversight for employees tasked with mass deletions of data;

h.    Received examples of CashCall accounts still reporting with patent errors in June 2015 and took no action whatsoever for more than four months;

i.    Received examples of more than 40,000 CashCall accounts still reporting in October 2015 and failed to properly correct the error given that CashCall accounts were still on file as recently as July 2016;

j.    Ignored numerous pleas from representatives of CashCall requesting confirmation that the Western Sky accounts had been deleted; and

k.    Received nearly 300 disputes regarding accounts reporting under CashCall subcode 2292030 after the accounts were supposed to have been deleted indicating Experian's processes for communicating between departments was infrequent or non-existent.

131.  Pursuant to 15 U.S.C. § 1681n, Experian is liable to Plaintiff and the Class for willfully failing to employ and follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's and Class members' credit reports, information and files, in violation of 15 U.S.C. § 1681e(b).

132.   Plaintiff and the Class are entitled to statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations pursuant to 15 U.S.C. § 1681n(a)(1)(A).

133.   Plaintiff and the Class are entitled to such amount of punitive damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(2).

134.   Plaintiff and the Class are further entitled to recover their costs and attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the proposed Class, prays for relief as follows:

a.   Certification of this action as a class action pursuant to Federaul Rule of Civil Procedure 23(b)(3);

b.   Appointment of Plaintiff as Class Representative and her counsel as Class Counsel;

c.   A finding that Experian's violations were willful;

d.   Statutory damages as provided for by 15 U.S.C. § 1681n(1);

e.   Punitive damages as provided for by 15 U.S.C. § 1681n(2);

f.   Costs and attorneys' fees as provided for by 15 U.S.C. § 1681n(3) and 15 U.S.C. § 1681o(a)(2); and

g.   All further relief as the Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff and members of the proposed Class demand a trial by jury.

CLASS ACTION COMPLAINT

Dated: April 6, 2017                    Respectfully submitted,


                                   By:   /s/ Jason S. Hartley
                                         Jason S. Hartley
                                         STUEVE SIEGEL HANSON LLP
                                         550 West C Street, Suite 1750
                                         San Diego, CA 92101
                                         Tel: 619-400-5822
                                         Fax: 619-400-5832
                                         hartley@stuevesiegel.com

                                         *Attorney for Plaintiff and the Class*

CLASS ACTION COMPLAINT